In the

# United States Court of Appeals

## For the Seventh Circuit

No. 04-2710

GEORGE STERGIOPOULOS & IVELISSE CASTRO,

*Plaintiffs-Appellants,*

*v.*

FIRST MIDWEST BANCORP, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 CV 5812—**Blanche M. Manning**, *Judge.*

ARGUED APRIL 6, 2005—DECIDED OCTOBER 25, 2005

Before BAUER, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* A few years ago, Ivelisse Castro and George Stergiopoulos each decided to buy a new car. Castro wanted a Toyota 4Runner, while Stergiopoulos fancied a Chevrolet Camaro. When each of them sought financing, their respective car dealers shopped the potential loans (or, as they were called, Retail Installment Contracts (RICs)) to third-party lenders. One of the third-party lenders to consider both loans was the defendant, First Midwest Bancorp, Inc. In deciding whether to pur-

chase the plaintiffs' RICs, First Midwest requested the plaintiffs' credit reports. First Midwest apparently did not care for what it saw there, because it refused to take on either Castro's or Stergiopoulos's RIC.

This is a common scenario. Dealers routinely attempt to assign tentative financing arrangements to lenders, and those lenders often rely on a consumer's credit report to determine whether the deal is worth taking. The question before us is whether, despite its routine nature, this practice is legal. Stergiopoulos and Castro contend that it is not. In their complaint, styled as a class action though no class was ever certified, they assert that First Midwest has been violating the Fair Credit Reporting Act (FCRA or Act), 15 U.S.C. § 1681 *et seq.*, by requesting consumers' credit reports without the consumers' knowledge or explicit consent. First Midwest filed a motion for summary judgment before the district court, arguing that the FCRA authorized its actions. The district court so found and granted judgment for First Midwest. We affirm.

# I

First Midwest has an arrangement with various car dealers whereby the dealers offer First Midwest the chance to purchase tentative loan agreements or RICs that the dealers have arranged with potential car buyers. If First Midwest decides not to purchase a particular RIC, the dealer may provide the financing itself or it can attempt to renegotiate the RIC with the buyer, hoping that First Midwest will find the new terms more appealing. The initial contract between buyer and dealer generally spells out this process, leaving out the details that are the focus of this appeal. Most importantly, the documents signed by the buyers do not state specifically that the dealers could shop their contracts to any number of potential third-party lenders. In particular, the contracts that Stergiopoulos and Castro signed made no mention of First Midwest.

Stergiopoulos's "Purchase Contract" with Rizza Buick, the Camaro dealer, had this to say about the financing arrangement:

> **DEALER ARRANGED FINANCING.** In the event of a time sale, RIZZA SHALL NOT BE OBLIGATED TO SELL UNTIL AND UNLESS a finance source approves this order and agrees to purchase a retail installment contract between Customer and Rizza based on this order. As part of obtaining financing, Customer agrees to provide Rizza with a true, correct and complete credit application and to cooperate fully in obtaining financing including the providing of any supporting documentation. This agreement may be canceled by Rizza if Rizza determines that it cannot obtain third party approval and may be canceled by either party if no financing is obtained for Customer on the agreed terms within 15 business days of the date of this agreement.

His signed financing application with GMAC said only "I authorize an investigation of my credit and employment history and the release of information about my credit experience with GMAC."

Castro signed an installment contract at Union Nissan, Inc., for her vehicle; that agreement stated that payments should be made to Great Lakes Credit Union as assignee. She also signed an application for credit with Nissan Motor Acceptance Corp. (NMAC), which included the following statement:

> You are authorized to check my credit and employment history and to answer questions about your credit experience with me. In connection with your your [*sic*] application for credit, a consumer report may be requested. On your request we will advise you if the report was actually ordered and if so, the name and address of the agency that furnished the report. Subsequent consumer reports may be ordered.

Neither Castro's nor Stergiopoulos's credit application mentioned that, in addition to NMAC and GMAC, respectively, third-party lenders unknown to the plaintiffs might also order copies of their reports. Nonetheless, it was clear that the transaction contemplated sale of the paper to another entity. It is also undisputed that the dealers selected First Midwest in these two cases, and the customers had nothing to do with that choice.

## II

The FCRA expressly states that its purpose is to ensure "that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b). In an attempt to achieve this balance between consumer privacy and the needs of a modern, credit-driven economy, the Act "limit[s] the furnishing of consumer reports" to certain statutorily enumerated purposes. 15 U.S.C. § 1681e(a). If an entity requests a report for a purpose not listed in the Act, an injured consumer can recover the "actual damages" caused by negligent noncompliance, see 15 U.S.C. § 1681o(a)(1), or both actual and punitive damages caused by willful noncompliance, see 15 U.S.C. § 1681n.

The plaintiffs contend that nothing in the Act authorized First Midwest to request their reports and that First Midwest's requests weakened their credit ratings. First Midwest disputes that its actions harmed the plaintiffs and argues that, in any event, the Act allowed the requests. First Midwest relied on § 1681b(a)(3)(A) and (E):

（a) Subject to subsection (c) of this section, any consumer reporting agency may furnish a consumer

report under the following circumstances and no other:

. . .

(3) To a person which it has reason to believe—

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review of collection of an account of, the consumer; or

. . .

(E) intends to use the information, as a potential investor or servicer, or current issuer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation.

We start with subparagraph (3)(A). The plaintiffs contend that First Midwest was not authorized to receive the plaintiffs' credit reports under this provision because no "credit transaction involving the consumer" existed between the plaintiffs and First Midwest. In their view, there were two wholly separate transactions: one between each plaintiff and his or her dealer, and another between the dealer and First Midwest. Castro and Stergiopoulos argue that the second transaction was divorced from the first to such a degree that they were no longer "involved" in it.

In support of this position, the plaintiffs rely on *Andrews v. TRW, Inc.*, 225 F.3d 1063, 1067 (9th Cir. 2000), *rev'd on other grounds*, 534 U.S. 19 (2001). *Andrews* concerned identity theft, where an individual had stolen the plaintiff's Social Security number in order to obtain credit. The plaintiff sued a credit reporting agency, contending that the agency had acted negligently by allowing the imposter to obtain access to her credit report. The credit agency argued that subparagraph (3)(A) authorized its

actions because the imposter's credit report request "involved" the plaintiff. The Ninth Circuit rejected this position, finding the agency's interpretation of subparagraph (3)(A) too broad. 225 F.3d at 1067 ("We are reluctant to conclude that Congress meant to harness any consumer to any transaction where any crook chose to use his or her number.").

The situation here is quite different. The plaintiff in *Andrews* was a bystander, unwittingly "involved" because of an imposter's deception. Here, in contrast, Stergiopoulos and Castro initiated the credit transactions at the car dealerships by requesting financing. While they did not know that First Midwest in particular was going to request their credit reports, they were aware that the transactions contemplated sale of the RIC to a third party, and the statute does not require that consumers expressly approve each request for a report. The use of the word "involved" implies that the entity obtaining the credit report may not have a predicate credit transaction with the consumer directly; instead, on its face, the provision merely requires that the entity must be engaged in a credit transaction in which the consumer is participating. Here, the car dealer served as a broker. If First Midwest had accepted the plaintiffs' RICs, the dealer would no longer have been part of the relationship. First Midwest would have sent bills directly to the plaintiffs; the plaintiffs would have paid First Midwest directly. By requesting the plaintiffs' credit reports for the sole purpose of determining whether to furnish the plaintiffs with credit, First Midwest satisfied the FCRA's requirement that it "intend[ed] to use the information in connection with a credit transaction involving" Castro and Stergiopoulos.

The plaintiffs warn that this reading extends the Act too far and that it makes it too easy for anyone to request a credit report without the consumer's knowledge. While it may be a better practice for car dealers explicitly to inform

their customers that unknown third-party lenders might request the customers' credit reports, we are not convinced that a failure to do so violates the FCRA as it is now written. An entity may rely on subparagraph (3)(A) only if the consumer initiates the transaction. A third party cannot troll for reports, nor can it request a report on a whim. Rather, there must be a direct link between a consumer's search for credit and the bank's credit report request. If the connection between a consumer's search and a bank's request is clear, it is unlikely that the request will infringe the consumer's privacy interests, for it will "involve" the plaintiff directly. See *Cole v. U.S. Capital*, 389 F.3d 719, 725 (7th Cir. 2004) ("Many of the enumerated permissible purposes set forth in § 1681b are transactions initiated by the consumer; these purposes therefore do not create significant privacy concerns."). Here, First Midwest pulled the plaintiffs' credit reports only because the plaintiffs sought financing for their new cars. The line of causation was direct and thus the request fell within the purview of subparagraph (3)(A).

Fortunately for the defendants, the FCRA requires only one permissible purpose; we note for the sake of completeness that First Midwest would have been out of luck if it had been required to rely on subparagraph (3)(E). That provision applies only if an entity requests a consumer's credit report "in connection with . . . an existing credit obligation." Here, there was an existing contractual obligation, not an existing credit obligation, between the plaintiffs and their car dealers. Recall that Rizza Buick had the right to cancel its agreement with Stergiopoulos if the search for financing on the agreed terms was unsuccessful. A credit obligation would arise only if and when the dealer or a third party agreed to finance the purchase of the car. Since neither event had occurred by the time First Midwest requested the plaintiffs' credit reports, no credit obligation yet existed. Without such an obligation, subparagraph (3)(E) does not come into play.

### III

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*